REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Meryl Macklin, California Bar No. 115053
Rachel Beck, California Bar No. 284984
**BRYAN CAVE LEIGHTON PAISNER LLP**
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4070
Telephone:      (415) 675-3400
Facsimile:      (415) 675-3434
E-Mail:          meryl.macklin@bclplaw.com
                     rachel.beck@bclplaw.com

Attorneys for Plaintiff
INTANGO, LTD.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTANGO, LTD, an Israeli limited company,<br><br>                    Plaintiff,<br><br>         v.<br><br>MOZILLA CORPORATION, a California corporation,<br><br>                    Defendants. | Case No.:<br><br>**INTANGO'S COMPLAINT FOR**<br><br>    **BREACH OF CONTRACT;**<br><br>    **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>    **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200;**<br><br>    **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br><br>    **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br><br>    **DECLARATORY RELIEF** |

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

Intango, LTD ("Intango") files this Complaint against Defendant Mozilla Corporation ("Mozilla") and, demanding a trial by jury on all issues so triable, alleges as follows:

## PARTIES

1.      Plaintiff Intango is a privately-held technology company headquartered in Tel - Aviv, Israel that operates in the digital media space, designing and executing tailored marketing and monetization solutions that use AI-driven proprietary technology and architecture.

2.      Defendant Mozilla is a corporation organized under the laws of the State of California and located at 331 East Evelyn Avenue, Mountain View, California 94041.   Mozilla has developed a popular web browser known as Firefox.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this Complaint under 28 U.S.C § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Mozilla because it is a citizen of California and a resident of Santa Clara County, California. Moreover, the parties each agreed to submit to the exclusive jurisdiction of the courts located within Santa Clara County to resolve any legal matters ████████████████████████████████████████████████ ████████████████████, and/or arising from the June 10, 2019 Firefox Add-on Distribution Agreement ("Firefox Add-on Distribution Agreement"), attached hereto as <u>Exhibit B</u>, which are now at issue.

5.      Venue in this Court is proper pursuant 28 U.S.C. § 1391 because Mozilla resides, transacts business, and maintains its principal place of business in this District, and the acts giving rise to the claims herein occurred in this District.

## FACTS

6.      Among other services, Intango develops and markets web extensions, also called add-ons, that its users can install to their web browsers to enhance their browsing experience. Add-ons are software modules that customize a web browser. For example, parents who want to limit their children to age-appropriate web browsing can install Intango's Safe Browsing Add-on.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

For users who have given consent and activated the "safe then" tab function, the Safe Browsing Add-on enables the detection and filtering of potentially offensive or otherwise problematic pages and content so that users are presented with only safe search results.

7.     Mozilla developed and owns the web browser Firefox. Web browsers are software applications that allow people to access the Internet. Web browsers rely on search engines, like those offered by Google and Yahoo, to search the Internet.

8.     Search engines pay browsers royalties in exchange for the browser directing online traffic to the search engine. Intango is informed and believes that in 2018, over $429 million of Mozilla's nearly $450 million in total revenue was generated by royalties from search engine partnerships.[1] As of November 2017, Firefox replaced Yahoo with Google as Firefox's primary default search engine, and Google is currently Firefox's default search engine in all but four countries.[2]

9.     Intango has developed and distributed approximately fifty (50) add-ons for the Firefox browser since creating a developers' account in May 2015. To do so, Intango entered into and agreed to abide by the Firefox Add-on Distribution Agreement and Review Policies, versions of which are attached hereto as Exhibit B (June 10, 2019 Firefox Add-on Distribution Agreement and December 2, 2019 revised Review Policies).

10.     Intango does not charge its users to install its add-ons. Instead, just as Firefox generates revenue by directing online traffic to Google, Intango generates the bulk of its add-on revenue by directing online traffic, as measured by post-search "clicks," to Yahoo.[3] Intango and Mozilla are therefore direct competitors in the context of directing online traffic to search engines. Intango and Mozilla are not the only companies competing in this industry. Rather, Intango is informed and believes that there are other developers who have created and distributed add-ons for Firefox that generate revenue by partnering with, and directing online traffic to, various search

[1]   *See* Mozilla Foundation and Subsidiary (2019) *Independent Auditors Report and Consolidated Financial Statements as of December 31, 2018 and 2017*. Available at: https://assets.mozilla.net/annualreport/2018/mozilla-fdn-2018-short-form-final-0926.pdf (accessed: March 20, 2020).
[2]   Upon information and belief, Google is the default search engine for Firefox in all markets except Turkey, Belarus, Kazakhstan and China.
[3]   Intango also generates revenue from its extensions by other means not relevant to the present matter.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1    engines.

2    11.    Functionally, Intango's add-ons execute proprietary, customizing features offered

3    by the extension (e.g., provide for safe browsing, generate movie-oriented search results, etc.)

4    while simultaneously directing traffic to Yahoo by setting a search url within the add-on and

5    redirecting the user's search engine to Yahoo. The benefit to using Intango's add-ons rather than

6    just using the search functionality within Yahoo is that Intango has created proprietary algorithms

7    that make the search results more targeted and therefore useful by, for example, directing the user

8    to relevant search results hits for "Jaws" while using the GetMedia – Movies extension, while

9    simultaneously executing the proprietary, customizing features offered by the extension. Intango

10    did not invent this method of using a third-party search provider in its add-ons. The redirect is

11    necessary because each add-on must utilize a search engine to facilitate its key features. Utilizing

12    the search engine is only possible through partnership with a browser company such as Yahoo.

13    **First Wave of Takedowns**

14    12.    On February 26, 2019, Mozilla abruptly and without notice disabled seven of

15    Intango's add-ons, including: Safe Browsing, GetMedia – Movies, GoMusic, GoMovies, Sport

16    TV, Universe Start and Media Start (the "Original Extensions").

17    13.    In doing so, Mozilla caused Intango to irreparably lose its userbase—a valuable

18    asset that Intango had expended significant time and resources building over the years. Intango

19    could not recapture this userbase by simply uploading an updated version of each add-on that

20    incorporated any changes required by Mozilla because Mozilla had blocked developer access to

21    the add-ons. Uploading a completely new add-on would also be ineffective as the prior users

22    would have to download the new add-on and would have no way of knowing that it was available

23    other than by searching through the entire Firefox catalog of add-ons.

24    14.    In addition to disabling the add-ons and causing Intango to irreparably lose its

25    corresponding userbase, Mozilla publicly and improperly flagged the add-ons as "malware."

26    Malware is software designed to disrupt, damage, or gain unauthorized access to a users' computer

27    system. Intango's add-ons are not malware under this or any definition.  By erroneously labeling

28    the add-ons as malware, Mozilla instantaneously damaged Intango's reputation among its users

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

and the public in general.

15.     Prior to this takedown, Firefox had never blocklisted or taken any form of administrative action against any add-ons developed or distributed by Intango.

16.     Despite an express policy of doing so, Mozilla failed to provide Intango an advanced warning, let alone an opportunity to rectify any concerns, prior to disabling the add-ons. Nor did Mozilla notify Intango about the block after it occurred.

17.     Intango only discovered that Mozilla had blocklisted its extensions incidentally while reviewing its developer account.

18.     Alarmed by the block and losing revenue by the minute, Intango immediately investigated possible reasons for Mozilla's actions. Intango developers first visited the Firefox Browser Add-on gallery, but found no explanation. They next attempted to install the add-ons as a new user. Upon installing the extensions, the developers received message prompts stating that each add-on had been "disabled due to security or stability issues," and that each "violate[d] Mozilla add-on policies by including abusive search behavior." No additional detail was provided.

19.     Intango then scoured Mozilla's most recent policies and developer guidelines to determine where any potential stability issues or policy violations could lie. In doing so, Intango discovered that the code used in the Original Extensions was potentially incompatible with a new search override API ("application programming interface") that had been introduced by Firefox 57. Intango quickly updated each extension's code to meet the new search override API.

20.     Prior to the takedown, Intango was unaware of any potential incompatibility with the new search override API as Mozilla had not previously announced what turned out to be a significant change. Mozilla's failure to alert developers of this change runs counter to industry practice. When similar platforms such as Google or Facebook introduce a change in policy or API, they send out formal announcements and notice to all developers prior to implementation. Notice gives developers an opportunity to make any needed adjustments. Platforms also commonly provide developers with an "integration period" during which the platform refrains from taking down existing products and userbases that it deems noncompliant. Instead, the platform blocks the option of uploading new products that are noncompliant. Integration periods can last as long as

twelve months, and they are critical for developers to timely comply with new policies and/or API without losing the valuable userbases the developer had built over the years. Unfortunately, Mozilla offered neither notice nor an integration period.

21.     As Intango feverishly sought to uncover and then remedy any incompatibility issues within 24 hours of discovering the block, it simultaneously emailed Mozilla requesting further explanation and assistance. Intango assured Mozilla that it had reviewed the most recent guidelines and updated the Original Extensions to ensure compatibility with the new API. Intango also supplied links to examples of the updated extensions and explained that any incompatibility had been wholly unintentional. With the only potential incompatibility issue resolved, Intango requested that Mozilla lift the block to allow Intango to upload the refurbished extensions so that its userbase could access the updates.

22.     Mozilla's initial response to Intango's emails provided no additional information or explanation, but merely stated that the "add-ons will stay blocked" because Mozilla did "not believe this happened accidentally as you [Intango] claim in your email."

23.     Not understanding what this could mean, Intango replied immediately, offering to provide Mozilla with access to any and all relevant information, documentation, source code, logs, and/or analytics necessary to demonstrate compliance with all applicable policies. Intango also invited Mozilla to review its Terms of Service and Privacy Policy, which provide full user transparency, detailed instructions for removal of web extensions, and contact information for 24-7 customer support.

24.     When Mozilla did not respond, Intango followed up by email on February 27, 2019 and again on March 1, 2019, pleading with Mozilla to provide guidance regarding what Intango needed to do to have the Original Extensions reinstated. Intango relayed that it was incurring significant reputational and monetary damage every hour the add-ons remained disabled.

25.     Mozilla finally replied the evening of March 1, 2019 with a single line email: "as stated previously, after reviewing your case we have decided the blocks will not be reverted."

26.     On March 3, 2019, having heard nothing further from Mozilla, Intango's general counsel sent Mozilla's legal department a letter detailing the foregoing and requesting that Mozilla

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1    work with Intango to reinstate the add-ons.

2         27.    Mozilla's in-house counsel responded on March 26, 2019—fully one month after

3    the takedown, which was causing irreparable damage—asserting that the add-ons violated the

4    Firefox Add-on Distribution Agreement and Review Policies by (1) "secretly redirect[ing] users'

5    internet searches" and (2) "track[ing] users' search activity" via a "cookie" that allegedly

6    "leak[ed] personal user information to a third party".

7         28.    Intango's counsel addressed Mozilla's alleged concerns the next day. First, counsel

8    identified where each of the add-ons explicitly disclosed to potential users how the extensions

9    functioned, including their effect on a user's search traffic. Second, counsel explained that the

10   only use of the "cookies" was functional, namely, tracking use of the extensions, and that it did

11   not collect, store or leak the personal information of the user.

12        29.    Receiving no response to its March 27, 2019 correspondence, Intango retained

13   outside counsel to serve a demand letter on Mozilla.

14        30.    

15   

16   

17        31.    

18   



BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

COMPLAINT

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

32.

33.

34.

8
COMPLAINT

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████

7      35.     █████████████████████████████████████ it took *three months* for

8 Mozilla to lift the block on Intango's add-ons. During this time Intango's developers spent

9 thousands of hours obtaining timely cooperation by Mozilla's developers and then proceeding

10 through an unnecessarily complicated approval process. For example, Mozilla required that

11 Intango make several adjustments to their add-on's installation/distribution flow, which is the

12 process that ultimately leads to the user completing installation of the add-on. Adjustments to the

13 add-ons' flow required rewriting and redesigning the add-ons' store descriptions, landing pages,

14 disclaimers and consents, and associated legal documents, including the applicable privacy policy

15 and end user licensing agreement.  The tedious approval process caused further delay as Mozilla

16 was slow to respond, required that Intango strip down the add-ons' primary functionality, and

17 imposed what seemed to be an impossibly strict interpretation of the then-applicable policies.

18      36.     Mozilla further required that Intango repeatedly detail the functionality of each

19 add-on, including precisely how the add-ons utilize Yahoo. In doing so, Intango was required to

20 disclose to Mozilla that it had a contract with Yahoo through which Intango generated revenue

21 from directing online traffic to Yahoo via certain add-ons, a standard industry practice. Intango

22 was not concerned that Mozilla could potentially use information disclosed during the approval

23 process, including the existence of its Yahoo agreement, against it. In retrospect, it should have

24 been.

25      37.     Although the approval process was unreasonable in length and scope, Intango

26 complied with all of Mozilla's demands. Acting proactively, Intango even developed a new

27 methodology for creating and onboarding future extensions based on Mozilla's feedback in order

28 to avoid issues in the future.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

38.     Finally, in November 2019, Intango received Mozilla's approval and uploaded Approved New Versions for five of the seven previously blocklisted add-ons. Intango had focused its limited resources on obtaining Mozilla's approval for these five add-ons first because they were the most popular among users. After expending significant resources proceeding through the tedious approval process, Intango decided not to divert further resources to reinstating the remaining two blocked Add-ons. Instead, Intango focused such resources on more fruitful endeavors.

39.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

40.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

41.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

42.     ████████████████████████████████████████████

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████

5       43. ████████████████████ Intango was unable to reinstate its userbase.

6       44.     Intango nevertheless continued to develop and distribute add-ons compatible with

7 Firefox. Indeed, hoping to avoid a repeat of the 2019 blocklisting debacle, Intango designed and

8 distributed all of its new add-ons in compliance with the various requirements Mozilla had

9 imposed during the three-month approval process.

10       45.     Intango was therefore shocked when, once again, Mozilla abruptly disabled another

11 group of its add-ons in early 2020.

12 <u>**Second Wave of Takedowns**</u>

13       46.     On February 11, 2020, Mozilla disabled twenty-two of Intango's add-ons,

14 including certain Approved New Versions of extensions that Intango had just spent three months

15 working closely with Mozilla to reinstate.

16       47.     For seven of the add-ons disabled on February 11, 2020, Intango received emails

17 from Mozilla purporting to give Intango two weeks to "amend" the add-ons. Mozilla claimed the

18 add-ons had been disabled for violating its policies by "collecting search terms or intercepting

19 searches that are going to third-party search provider." Intango's add-ons, however, did not

20 "collect" user search terms or "intercept" searches. Mozilla knew this because of the extensive

21 process that Intango had just gone through to get such add-ons approved. Additionally, as in 2019,

22 Mozilla did not disclose how these extensions—which Mozilla had specifically approved less than

23 three months earlier—violated its policies. Nor did Mozilla provide any instruction on how to

24 "amend" the add-ons to rectify the alleged violation.

25       48.     Inexplicably, for the other fifteen add-ons subject to this second takedown, Mozilla

26 provided no advanced warning of its intent to block, nor did it provide an opportunity to "amend"

27 the add-ons to rectify the alleged violation. Mozilla's disparate treatment of Intango's add-ons was

28 both unjustified and arbitrary. Indeed, the only apparent distinction between the two groups was

1   that those for which Mozilla provided notice had no userbase at the time, largely due to ███

2   ████████████████████████████████████   and the fifteen subject to immediate takedown

3   each had a userbase, which was then irreparably lost following the takedown.

4       49.    As of February 11, 2020, Mozilla had entirely removed the fifteen add-ons along

5   with each corresponding userbase. Trying to ascertain the reason for this removal, Intango

6   developers searched Mozilla's online postings regarding blocked add-ons and discovered one such

7   post that claimed its add-ons had been blocked for the same supposed reason as the other seven,

8   and that Mozilla had claimed that its extensions also allegedly violated Mozilla's policies by

9   "collect[ing] the current url or domain" or "execut[ing] remote code."

10      50.    Perplexed by Mozilla's actions and once again facing significant reputational and

11  monetary damages, Intango immediately emailed the same Mozilla developers it had extensively

12  worked with during the months prior in an effort to reinstate its add-ons after the first round of

13  takedowns.

14      51.    On February 14, 2020, one of the Mozilla developers responded. The developer

15  explained that although Mozilla had previously approved the add-ons, they were being blocked for

16  violating a *new* Mozilla policy—the policy against collecting search terms or intercepting searches

17  going to a third-party search provider. The developer further explained: "We reviewed and

18  accepted your add-ons in 2019 before this policy was introduced . . . we require all add-ons to stay

19  compliant to the latest version of our policies."

20      52.    Intango was shocked to learn that Mozilla's interpretation of its new policy resulted

21  in it yet again disabling Intango extensions. Intango was particularly surprised because Mozilla

22  clearly knew about the upcoming policy changes as early as October 28, 2019 when it published a

23  blog post on the topic. Yet, at no time during the three-month approval process did Mozilla ever

24  suggest that it would interpret the new policy in a manner that would prohibit the very same

25  Intango add-ons that Mozilla was then scrutinizing prior to reinstatement. Nor did Mozilla indicate

26  the Intango add-ons risked violating the new policy when it finally approved the add-ons for

27  reinstatement on November 14, 2019.

28      53.    Moreover, Intango had submitted and Mozilla had approved several of the add-ons

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

subject to takedown *after* December 2, 2019, when the new policy supposedly went into effect. Intango had therefore relied on Mozilla's approvals and continued developing add-ons in accordance with the various requirements Mozilla had imposed during the three-month approval process.

54.    As with the first round of takedowns, Intango promptly sought resolution and reinstatement, requesting further detail on how the add-ons violated Mozilla's policies and reasserting its commitment to compliance. Intango even offered to fly to Mozilla's offices in Berlin or any other location to sit down and discuss how it could bring its add-ons into compliance.

55.    As in the past, Mozilla replied belatedly and only to restate that Intango's add-ons violated its policies without specifying how such violations were occurring or what Intango could do to cure the alleged violations.

56.    Finally, on February 24, 2020, Mozilla revealed that its new policy effectively banned any add-on that utilizes any search engine Mozilla disapproves of:

> "As mentioned before, your addons violate the following policy which you agreed to during submission: Search functionality provided or located by the add-on must not collect search terms or intercept searches that are going to a third-party search provider.
>
> Specifically, they do so by setting a search url in the manifest which redirects the user to a third-party search provider (in this case yahoo)."

57.    As Mozilla is well aware, it is impossible to offer an add-on that utilizes *any* third-party search engines without "setting a search url" and "redirecting" the user.

58.    Moreover, Mozilla had specifically learned that Intango's add-ons employ this functionality to utilize the Yahoo search engine during the course of the three-month approval process. Despite this knowledge, Mozilla never disclosed to Intango its intent to prohibit such functions mere weeks after approving add-ons that relied on such functions. Nor did Mozilla reveal that its "new" policy was apparently specifically targeting Intango's add-ons until it was pressed for an explanation.

59.    Now, after over a year of expending significant time and resources going above and

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

beyond to comply with every demand made by Mozilla, Intango finds itself worse off than it was in February 2019.

60.    As a direct, proximate and foreseeable result of Mozilla's misconduct, Intango has lost millions of dollars in revenue and continues to lose tens of thousands more each day its users are unable to use the blocklisted add-ons.

**FIRST CAUSE OF ACTION**

( ███████████████████████████████ )

61.    Intango incorporates by reference the allegations set forth in Paragraphs 1 through 60 as though fully set forth herein.

62.    ████████████████████████████████████████████████████████
████████████████████████

63.    ████████████████████████████████████████████████████████
███████████████████████████████████████

64.    ████████████████████████████████████████████████████████
████████████████████████

65.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

66.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████

67.    ████████████████████████████████████████████    Intango was unable to reestablish its lost userbase and has suffered and continues to suffer substantial reputational and monetary damage currently estimated to be in excess of $3 million, with the exact amount to be proven at trial.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

## SECOND CAUSE OF ACTION

### (Breach of Contract – Firefox Add-on Distribution Agreement)

68.     Intango incorporates by reference the allegations set forth in Paragraphs 1 through 60 as though fully set forth herein.

69.     Intango and Mozilla are parties to the Firefox Add-on Distribution Agreement, which constitutes a binding, written contract. Section 7 of the Firefox Add-on Distribution Agreement governs Content Removal and provides:

> (b)  Removal from Distribution by Mozilla.  Mozilla reserves the right (though not the obligation) to, in our sole discretion, remove or revoke access to any Listed or Unlisted Add-ons. This applies, but is not limited to, Add-ons that, in our reasonable opinion, violate this Agreement or the law, any applicable Mozilla policy, or is in any way harmful or objectionable. In addition, we may at any time remove Your Add-on from AMO; revoke Your Mozilla Certificate; blocklist an Add-on; delete your AMO account; flag, filter, modify related materials (including but not limited to descriptions, screenshots, or metadata); reclassify the Add-on; or take other corrective action.
>
> Ex. B, Firefox Add-on Distribution Ag. § 7.

70.     Intango satisfied all or substantially all of its material obligations under the Firefox Add-on Distribution Agreement that were not otherwise excused or waived.

71.     All conditions necessary for Mozilla to perform its obligations under the Firefox Add-on Distribution Agreement either occurred or were excused.

72.     Mozilla breached Section 7(b) of the Firefox Add-on Distribution Agreement in February 2020 by blocklisting twenty-two of Intango's add-ons in an arbitrary manner as evidenced by, among other things, the fact that the policy Mozilla now contends the add-ons violate was in effect at the time Mozilla approved the add-ons.

73.     Mozilla further breached Section 7(b) of the Firefox Add-on Distribution Agreement by blocklisting twenty-two of Intango's add-ons in an arbitrary manner as evidenced by, among other things, the fact that Mozilla was specifically aware of the allegedly improper functionality employed by the blocklisted add-ons at the time it approved each add-on.

74.     As a direct and proximate result of Mozilla's breach, Intango has suffered and

continues to suffer substantial reputational and monetary damage currently estimated to be in excess of $3 million, with the exact amount to be proven at trial.

### THIRD CAUSE OF ACTION

#### (Breach of the Covenant of Good Faith and Fair Dealing)

75.     Intango incorporates by reference the allegations set forth in Paragraphs 1 through 60 as though fully set forth herein.

76.     Every contract imposes upon each party an implied duty to act in good faith and in accordance with fair dealing in its performance and enforcement. This includes a duty to refrain from frustrating the purpose of those agreements and the reasonable expectations of parties in entering into them.

77.     As a result of entering ████████████████████ the Firefox Add-on Distribution Agreement, Mozilla had a duty to act in good faith and engage in fair dealing.

78.     Mozilla violated the covenant of good faith and fair dealing by committing the following acts:

  a. Blocklisting on February 11, 2020 certain add-ons that Mozilla had reinstated ████████████████ in November 2019;

  b. Blocklisting on February 11, 2020 certain add-ons ███████████ ████████████████ that substantively complied with and were distributed in alignment with all of the requirements Mozilla had imposed on add-ons ████████████████████;

  c. Blocklisting on February 11, 2020 fifteen add-ons without providing Intango any advanced notice despite provisions in Mozilla's Review Policies that instruct it to do so prior to taking such action;

  d. Blocklisting twenty-two of Intango's add-ons in an arbitrary manner as evidenced by the fact that the policy Mozilla now contends the add-ons violate was in effect at the time Mozilla approved the add-ons; and

  e. Blocklisting Intango's add-ons in bad faith as evidenced by the fact that Mozilla's policy, as described to Intango on February 24, 2020, effectively

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

prohibits all of Intango's add-ons that use third-party search engines.

79.     As a result of Mozilla's breach of the covenant of good faith and fair dealing, Intango has suffered and continues to suffer reputational and economic harm currently estimated to be in excess of $3 million, with the exact amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

**(Violation of California Business and Professions Code § 17200)**

80.     Intango incorporates by reference the allegations set forth in Paragraphs 1 through 60 as though fully set forth herein.

81.     California Business and Professions Code § 17200 defines unfair competition as including "any unlawful, unfair or fraudulent business act or practice. . . ."

82.     Mozilla engaged in unfair and unlawful business practices as follows:

    a.  ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████

    b.  Inducing Intango to disclose information concerning the functionality of its add-ons, which Mozilla then used against Intango by creating a new policy that prohibits the very same functionality;

    c.  Effectively prohibiting all add-ons that attempt to utilize Mozilla's former default search engine—Yahoo—thereby forcing add-on developers to use only Mozilla's preferred search engines, which are a source of revenue for Mozilla;

    d.  Intentionally interfering with Intango's contractual relations with Yahoo;

    e.  Engaging in conduct that significantly threatens or harms competition by effectively prohibiting all add-ons, including those distributed by Intango, that compete with Mozilla's ability to direct online traffic to search engines with which Mozilla has partnered;

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

f.  Engaging in conduct that significantly threatens or harms competition by taking down Intango's add-ons in a manner that caused it to irreparably lose each corresponding userbase, which Intango had expended significant time and resources developing, thereby ensuring that all search traffic by those users would be directed to search engines with which Mozilla has partnered;

g.  Engaging in conduct that significantly threatens or harms competition by failing to provide developers with notice of intent to modify its policies in a manner that would prohibit add-ons that compete with Mozilla's ability to direct online traffic to search engines with which Mozilla has partnered, and thereby denying developers an opportunity to amend their add-ons or notify their userbase of the upcoming change.

83.  As a result of Mozilla's violations of California Business and Professions Code § 17200, Intango has suffered and continues to suffer reputational and economic harm currently estimated to be in excess of $3 million with the exact amount to be proven at trial.

84.  In committing the acts alleged above, Mozilla acted with oppression, fraud, and/or malice, entitling Intango to recover punitive damages in amount appropriate to punish and deter Mozilla from engaging in similar conduct again.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Contractual Relations)

85.  Intango incorporates by reference the allegations set forth in Paragraphs 1 through 60 as though fully set forth herein.

86.  Intango has an enforceable contract with Yahoo pursuant to which Intango receives revenue from directing online traffic to the Yahoo search engine.

87.  The existence of this contract was disclosed to Mozilla representatives over the three-month period during which Intango worked with Mozilla to restore its add-ons after the first wave of Mozilla blocklisting.

88.  By improperly disabling various Intango add-ons on February 11, 2020, Mozilla knowingly and intentionally disrupted Intango's contractual relationship with Yahoo.

89.     By expelling Intango's add-ons from the Firefox platform, Mozilla prevented Intango's performance under its contract with Yahoo.

90.     Mozilla had no legitimate business purpose for disrupting Intango's contractual relations.

91.     As a result of Mozilla' interference, Intango has suffered and continues to suffer reputational and economic harm in an amount currently estimated to be in excess of $3 million, with the exact amount to be proven at trial.

92.     In committing the acts alleged above, Mozilla acted with oppression, fraud, and/or malice, entitling Intango to recover punitive damages in amount appropriate to punish and deter Mozilla from engaging in similar conduct again.

93.     Unless restrained, Mozilla will continue in the acts and conduct set forth above, to Intango's great and irreparable injury, for which damages will not afford adequate relief.

**SIXTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage)**

94.     Intango incorporates by reference the allegations set forth in Paragraphs 1 through 60 as though fully set forth herein.

95.     Intango had an economic relationship with Yahoo with a probability of future economic benefit.

96.     Intango expected and had reason to believe that its business relationships with Yahoo would continue for the foreseeable future.

97.     Mozilla knew about Intango's relationship as a result of Intango disclosing its existence over the course of the three-month period during which Intango sought to have its add-ons reinstated.

98.     By virtue of the acts alleged above, Mozilla knowingly, intentionally, and wrongfully interfered with Intango's prospective economic relationship with these users.

99.     Mozilla's conduct was independently unfair and unlawful as it violated the California Business and Professions Code § 17200 as detailed above and ██████████ ████.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1    100.    As a direct and proximate result of Mozilla's interference with Intango's

2    prospective relationship, Intango has suffered and continues to suffer reputational and economic

3    harm currently estimated to be in excess of $3 million, with the exact amount to be proven at trial.

4    101.    In committing the acts alleged above, Mozilla acted with oppression, fraud, and/or

5    malice, entitling Intango to recover punitive damages in amount appropriate to punish and deter

6    Mozilla from engaging in similar conduct again.

7    102.    Unless Mozilla is enjoined and restrained by this Court from continuing to interfere

8    with Intango's prospective economic relationships, Mozilla will continue such interference to

9    Intango's determent.

**SEVENTH CAUSE OF ACTION**

(███████████████████████████████████)

12   103.    Intango incorporates by reference the allegations set forth in Paragraphs 1 through

13   60 as though fully set forth herein.

14   104.    ███████████████████████████████████████

15   ████████████████████████████████████.

16   105.    ███████████████████████████████████████

17   ███████████████████████████████████████████

18   █████████████████████████

19   106.    ███████████████████████████████

20   107.    ███████████████████████████████████████

21   ███████████████████████████████████████████

22   ██████████████████████████████████████

23   108.    ████████████████████████████████████

24   █████████████████████████████

**EIGHTH CAUSE OF ACTION**

**(Declaratory Relief – Firefox Add-on Distribution Agreement)**

27   109.    Intango incorporates by reference the allegations set forth in Paragraphs 1 through

28   60 as though fully set forth herein.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1    110.    An actual controversy has arisen and now exists between Intango and Mozilla
2  concerning their respective rights and obligations under the Firefox Add-on Distribution
3  Agreement.

4    111.    Intango contends that Section 7 of the Firefox Add-on Distribution Agreement
5  prohibits Mozilla from blocklisting Intango's add-ons arbitrarily and/or without good cause.

6    112.    Intango is informed and believes that Mozilla disputes its contentions.

7    113.    Intango desires a judicial determination of the parties' rights and duties and a
8  declaration that Section 7 of the Firefox Add-on Distribution Agreement prohibits Mozilla from
9  blocklisting Intango's add-ons arbitrarily and/or without good cause.

10    114.    A judicial declaration is necessary and appropriate at this time in order that the
11  parties may ascertain their rights and obligations under the Firefox Add-on Distribution
12  Agreement.

### PRAYER FOR RELIEF

WHEREFORE, Intango prays for an award of relief against Mozilla as follows:

1.    For actual damages according to proof;

2.    For a declaration of the rights and obligations of the parties on the Seventh and Eighth Causes of Action;

3.    For an order directing Mozilla to:

   a.    Deactivate its blocklisting of Intango's add-ons;

   b.    Refrain from removing Intango's add-ons without first notifying Intango of any non-compliance issues;

4.    For an award of punitive and exemplary damages on the Fourth, Fifth and Sixth Causes of Action;

5.    For all interest recoverable by law, including prejudgment interest; and

6.    For such other relief as the Court deems just and proper.

### JURY DEMAND

Intango hereby demands a trial by jury as to all counts so triable.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1    Dated:  April 17, 2020                    BRYAN CAVE LEIGHTON PAISNER LLP

2

3                                              By:  /s/ Meryl Macklin

4                                                   Meryl Macklin
                                                    Rachel A. Beck
5                                                   Attorneys for Plaintiff
                                                    INTANGO, LTD.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

COMPLAINT